IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| COALITION FOR SECULAR GOVERNMENT, a Colorado nonprofit corporation, Plaintiff | ) ) ) ) ) | Judge No. |
| v. | ) ) ) | |
| SCOTT GESSLER, in his official capacity as Colorado Secretary of State, Defendant. | ) ) ) ) ) | |

## VERIFIED COMPLAINT

### NATURE OF ACTION

1. This case challenges certain provisions of Colorado Constitution Article XXVIII ("Article XXVIII"), the Fair Campaign Practices Act ("FCPA") as codified in Colorado Revised Statutes § 1-45-101 (2012) *et seq.*, and the campaign finance rules promulgated by the Colorado Secretary of State found at 8 C.C.R. 1505-6.

2. Plaintiff Coalition for Secular Government ("CSG") is a nonprofit corporation that advocates for a secular understanding of individual rights, including freedom of conscience and the separation of church and state. This advocacy takes the form of blog posts, video blogs, and a lengthy policy paper.

1

3.      CSG believes that, given its particular activities, Colorado may not constitutionally regulate it as an issue committee. But certain provisions of Colorado law appear to require CSG to register with the state and comply with burdensome reporting requirements.

4.      CSG reasonably fears that, should it fail to register with the state of Colorado as an issue committee, it and its officers may be subject to enforcement actions, investigations, and lawsuits. In fact, based on these fears, and confused by the vague and overbroad wording of Colorado's laws, CSG previously registered as an issue committee with the state of Colorado in 2008 and 2010. CSG's experiences with registration burdened their ability to speak, and CSG fears that registration in 2012 will again burden its activities.

5.      Consequently, CSG seeks a declaration that certain elements of Colorado's campaign finance laws are unconstitutional under the First and Fourteenth Amendments.

6.      CSG believes such provisions are unconstitutional both on their face and as applied to CSG's mission and activities.

7.      In the alternative, this Complaint seeks a declaration that the activity of CSG, as measured through its contributions and expenditures, is below the threshold of government interest as articulated in *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction because this action arises under the First and Fourteenth Amendments to the United States Constitution. *See* 28 U.S.C. § 1331.

9.      This Court also has jurisdiction because this action arises under Section 1 of the Civil Rights Act of 1871. *See* 42 U.S.C. § 1983; 28 U.S.C. § 1343a.

10. This Court also has jurisdiction under the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201 and 2202.

11. Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTIES

12. Plaintiff Coalition for Secular Government is a Colorado nonprofit corporation whose purpose is to promote a secular understanding of individual rights, including freedom of conscience, and the separation of church and state.

13. Defendant Scott Gessler is the Colorado Secretary of State, sued in his official capacity, as the person charged with enforcing Colorado's campaign finance law.

## STATEMENT OF FACTS

14. This case arises from overbroad and vague provisions of Article XXVIII and the FCPA. Article XXVIII went into effect on December 6, 2002. The FCPA went into effect in its most recent iteration on January 15, 1997.

15. CSG is a Colorado nonprofit corporation incorporated July 17, 2008. *See* Ex. 1

16. Diana Hsieh is the president of CSG.

17. Diana Hsieh has been the registered agent for Colorado campaign finance law purposes for CSG's issue committees in the past. If CSG is forced to register this year, Diana Hsieh will again serve as the registered agent.

18. CSG is not connected with any political party or political candidate.

19. CSG maintains a website which features a blog. The site receives an average of 5,000 hits per month.

20. The blog is updated, on average, 1-3 times per week with postings discussing philosophy, religion, current events, public policy issues, and other topics of importance to its readership.

21. The blog features occasional YouTube videos covering a topic or series of topics in-depth.

22. In addition to its blog, CSG also maintains a Facebook page with 230 "likes."

23. In 2008, CSG commissioned a Public Policy Paper on the "Personhood Movement," a document that has been subsequently updated. Ex. 2.

24. In its most recent form, the Public Policy Paper features arguments and counter-arguments for personhood laws and periodically mentions the 2010 Personhood Amendment (Amendment 62).

25. The Public Policy Paper is 34 pages long, not including 176 endnotes.

26. Only the last seven paragraphs of the Public Policy Paper features any discussion of voting for or against Amendment 62.

27. Of the last section, only the last sentence gives any call to action: "If you believe that 'human life has value,' the only moral choice is to vote against Amendment 62."

28. On information and belief, the possibility of the government regulating such a small quantum of expressive, political speech presents the problem raised by the Chief Justice of the United States that resulted in re-argument in *Citizens United v. FEC*, 130 S.Ct. 876, 895 (2010). Upon questioning by the Chief Justice at oral argument, the government admitted that a book published by a corporation, containing only one sentence of express advocacy, could be

banned under certain circumstances. *Id.* at 897, 904; *see also, id.* at 944, ftn. 31 (Stevens, J. dissenting).

29. The Public Policy Paper remains the principal product produced by CSG.

## 2008 ISSUE COMMITTEE

30. In 2008, without the advice of counsel and with no legal duty to do so, CSG registered "Coalition for Secular Government (CSG)" as a statewide issue committee, with an address in Sedalia, Colorado. Doing so required Dr. Hsieh to report to the government the address of the U.S. Post Offices and UPS stores where she bought stamps and made photocopies of the Public Policy Paper. *See* Ex. 3.

31. The purpose of the 2008 committee was to oppose Amendment 48, which was a constitutional amendment that sought to legally define the term "person" at conception.

32. Over its life, the committee reported collecting a total of $200 in monetary contributions and $229.25 in nonmonetary contributions, for a total of $429.25. Dr. Hsieh was the sole monetary contributor. All nonmonetary contributions were provided by Jennifer Armstrong for graphic design work.

33. The committee expended $195.52. The expenditures went to Office Max, the Post Office, and the UPS Store.

34. At the termination of the committee, $4.48 was returned to Dr. Hsieh. The Public Policy Paper was the only product distributed by the issue committee.

35. The 2008 committee terminated on December 4, 2008.

## 2010 ISSUE COMMITTEE

36. In 2010, CSG registered a new statewide issue committee "Coalition for Secular Government" with the purpose of opposing Amendment 62, a ballot issue similar to Amendment 48. *See* Ex. 4.

37. In October, 2010, Dr. Hsieh's house flooded and, as a consequence, she was one day late in filing a committee report. She was fined $50, and her fine was only waived after she sought an administrative remedy. *See* Ex. 5.

38. In 2010, CSG received a total of $2,951.16 in nonmonetary and monetary contributions, of which all the money was spent.

39. Facebook advertising totaled $179.97 for three advertisements. The Facebook ads linked directly to the CSG Public Policy Paper. *See* Ex. 6.

40. The first Facebook advertisement read as follows:

> No on Amendment 62
> Colorado's "personhood" amendment would violate the rights of women and endanger their lives. Find out how and why.

41. The second Facebook advertisement read as follows:

> No on Amendment 62
> Colorado's "personhood" amendment would violate the separation of church and state. Find out why. Vote NO on 62.

42. The third Facebook advertisement read as follows:

> No on Amendment 62
> To combat the new anti-choice crusaders, abortion rights need a better defense than Roe v. Wade. Find out why in this new policy paper.

43. CSG spent another $442.50 under the "Consultant & Professional Services" category to pay Jennifer Armstrong for graphic design and layout services related to the Public Policy Paper.

44. Ari Armstrong and Diana Hsieh each received $1,000 for reworking the Public Policy Paper.

45. The rest of the money was spent on the printing of flyers featuring information on how to obtain a copy of the Public Policy Paper.

46. During the 2012 election cycle, CSG wishes to act consistent with its purpose. Specifically, it intends to 1) update and expand the Public Policy Paper discussing the philosophical issues surrounding rights in pregnancy, particularly when a new human life becomes a person with rights, 2) distribute this Public Policy Paper to the general public, and 3) purchase advertising to promote the Public Policy Paper and its contents.

47. CSG plans to raise $3,500 or less for the purposes of paying each of the authors of the Public Policy Paper, design work, copy editing, flyers, and online advertising.

48. CSG plans to pay each of the authors of the Public Policy Paper $1,000. CSG will then use the remainder of the money for the publication and distribution of the Public Policy Paper. This will include roughly $500 for layout and other publishing expenses. Any remaining funds will be used to publicize the paper and expand its readership.

49. Article XXVIII, FCPA, and the registration and reporting requirements therein chill the speech of CSG and other organizations wishing to engage in public policy advocacy.

COUNT 1
(42 U.S.C. § 1983)
Declaratory Judgment concerning Colorado Constitution Article XXVIII § 2(10)(a)

50. Plaintiff realleges and incorporates by reference paragraphs 1 – 49.

51. Article XXVIII § 2(10)(a) expands the definition of an issue committee to any person or any group of two or more persons that either has "(I)…a major purpose of supporting or opposing any ballot issue or ballot question" or "(II)… accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question."

52. C.R.S. § 1-45-103(12)(b) defines "major purpose" as:

[S]upport of or opposition to a ballot issue or ballot question that is reflected by:

(I) An organization's specifically identified objectives in its organizational documents at the time it is established or as such documents are later amended; or

(II) An organization's demonstrated pattern of conduct based upon its: (A) Annual expenditures in support of or opposition to a ballot issue or ballot question; or (B) Production or funding, or both, of written or broadcast communications, or both, in support of or opposition to a ballot issue or ballot question.

53. The Colorado Secretary of State's campaign finance rules provide more detail in 8 C.C.R. 1505-6 Rule 1.12.3:

For purposes of determining whether an issue committee has "a major purpose" under Article XXVIII, Section 2(10)(a)(I) and section 1-45-103(12)(b)(II)(A), C.R.S., a demonstrated pattern of conduct is established by:

(a) Annual expenditures in support of or opposition to ballot issues or ballot questions that exceed 30% of the organization's total spending during the same period; or

(b) Production or funding of written or broadcast communications in support of or opposition to a ballot issue or ballot question, where the

8

production or funding comprises more than 30% of the organization's total spending during a calendar year.

54. In *Colo. Right to Life Comm., Inc. v. Coffman*, the Tenth Circuit held in an as-applied challenge that application of *Buckley*'s "the major purpose test" was required to determine whether a non-candidate organization was a political committee. *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1152-1153 (10th Cir. 2007) ("*CRTL*") (citing *Buckley v. Valeo*, 424 U.S. 1, 79 (1976)).

55. Furthermore, the *CRTL* court applied *FEC v. Mass. Citizens for Life, Inc.* ("*MCFL*"), which laid out two avenues for determining an organization's "major purpose": "(1) examination of the organization's central organizational purpose; or (2) comparison of the organization's independent spending with overall spending to determine *whether the preponderance of expenditures are for express advocacy* or contributions to candidates." *CRTL*, 498 F.3d at 1152 (emphasis added) (citing *FEC v. Mass. Citizens for Life, Inc*, 479 U.S. 238, 252 n. 6 and 262 (1986)).

56. The "major purpose test" is not optional. A definition of "issue committee" that subjects organizations having other "major purposes" to the strictures and burdens of campaign disclosure rules is legally overbroad.

57. Nevertheless, Colorado campaign finance law begins regulating speech when a group only has "a major purpose," giving rise to the possibility of multiple major purposes. This is confirmed by the 30% standard articulated under C.R.S. § 1-45-103(12)(b)(II)(A) and 8 C.C.R. 1505-6 Rule 1.12.3(a).

58. By dispensing with the "preponderance" standard required under *Buckley* and *MCFL,* Colorado has swept numerous organizations into its campaign finance regulations that it may not constitutionally regulate. Therefore, Article XXVIII § 2(10)(a)(I) is unconstitutionally overbroad on its face.

59. With the possibility of having multiple major purposes, Article XXVIII does not put organizations on notice as to when they become an issue committee and must register. The result is that organizations' speech is chilled. Therefore, Article XXVIII § 2(10)(a)(I) is facially unconstitutional for both vagueness and overbreadth.

60. Similarly, CSG has a long history of engaging in philosophical debate and education on a variety of topics. Its efforts included composing the Public Policy Paper which discusses philosophical, ethical, and legal concepts. The fact that these efforts reference Colorado initiatives is not their primary purpose. To the extent Article XXVIII § 2(10)(a) seeks to govern CSG, it is unconstitutional as applied.

## COUNT 2
## (42 U.S.C. § 1983)
### Declaratory Judgment on Expenditures

61. Plaintiff realleges and incorporates by reference paragraphs 1 – 60.

62. Article XXVIII § 2(8)(a) defines "expenditure" as:

> [A]ny purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of expressly advocating the election or defeat of a candidate or supporting or opposing a ballot issue or ballot question. An expenditure is made when the actual spending occurs or when there is a contractual agreement requiring such spending and the amount is determined.

63. However, under Article XXVIII § 2(8)(b), an "expenditure" is not:

> (I) Any news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party;
>
> (II) Any editorial endorsements or opinions aired by a broadcast facility not owned or controlled by a candidate or political party;
>
> (III) Spending by persons, other than political parties, political committees and small donor committees, in the regular course and scope of their business or payments by a membership organization for any communication solely to members and their families....

64. C.R.S. § 1-45-103(10) (2012) simply incorporates Article XXVIII's definition: "'Expenditure' shall have the same meaning as set forth in section 2 (8) of article XXVIII of the state constitution." The Colorado campaign finance rules provide no additional guidance.

65. If spending in connection with a public policy paper is an "expenditure," any organization wishing to discuss public policy may be subject to the full burden of Colorado's campaign finance laws. Thus, CSG faces registration and regulation if its spending in connection with producing its Public Policy Paper is an "expenditure."

66. Moreover, the mentioning of a Colorado initiative in the context of a lengthy paper discussing a large topic of public interest does not convert that paper into "express advocacy" and the entirety of its funding into an "expenditure."

67. Therefore, the law as applied to CSG and its Public Policy Paper is vague and overbroad in that it reaches speech conducted without the major purpose of supporting or defeating a candidate, ballot issue, or ballot question. *See Buckley v. Valeo*, 424 U.S. at 79-80.

68. Money spent producing public policy papers cannot be "expenditures" because such public policy papers are not converted into express advocacy by merely mentioning

11

ongoing policy debates. Doing so unconstitutionally chills speech on any topic which may come before the electorate.

## COUNT 3
(42 U.S.C. § 1983)
Declaratory Judgment on Press Exemption

69. Plaintiff realleges and incorporates by reference paragraphs 1 – 68.

70. Article XXVIII § 2(7)(b) specifically excludes media writings and broadcasts from the definition of "expenditures" so long as the company is not owned by a candidate or political party. Specifically, any news articles, editorial endorsements, opinion or commentary writings, and letters to the editor are exempted from newspapers, magazines, or other periodicals. Editorial endorsements or opinions aired by broadcast facilities are also exempt.

71. C.R.S. § 1-45-103(12.5) (2012) defines "media outlet" as "[A] publication or broadcast medium that transmits news, feature stories, entertainment, or other information to the public through various distribution channels, including, without limitation, newspapers; magazine; radio; and broadcast, cable, or satellite communication."

72. Article XXVIII § 2(7)(b) and C.R.S. § 1-45-103(12.5) are unconstitutionally vague in that they do not cover public policy papers nor do they address distribution via the Internet.

73. Publications covering philosophical, social, and ethical matters are protected by the First Amendment. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 231 (1977). Likewise, material published through the Internet is also protected by the First Amendment. *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1151 (9th Cir. 2004).

74. CSG provides a blog that features news, information, commentary, and discussion of religion, constitutional rights, and philosophy. These projects are maintained and regularly updated in non-election years, and are part of the context for its activities during election years.

75. The Public Policy Paper qualifies as press because it conveys news and analysis on current events and developments in law and public policy on abortion and individual rights. CSG ensures that the Public Policy Paper is current and seeks to expand its coverage and depth.

76. Consequently, as applied, the funds expended on the Public Policy Paper must be included in the press exemption and are therefore not expenditures under Colorado's campaign finance laws.

77. CSG seeks a declaration that its activities are covered by Colorado's press exemption.

78. In the alternative, CSG seeks a declaration that the definition of "expenditure" is unconstitutionally overbroad as applied.

COUNT 4
(42 U.S.C. § 1983)
Declaratory Judgment on Threshold for "Written or Broadcast Communication"

79. Plaintiff realleges and incorporates by reference paragraphs 1 – 78.

80. C.R.S. § 1-45-103(12)(b)(II)(B) states that a major purpose may be found where an organization provides: "[p]roduction or funding, or both, of written or broadcast communications, or both, in support of or opposition to a ballot issue or ballot question."

81. Furthermore, 8 C.C.R. 1505-6 Rule 1.12.3(b) states that "[p]roduction or funding of written or broadcast communications in support of or opposition to a ballot issue or ballot

question, where the production or funding comprises more than 30% of the organization's total spending during a calendar year," triggers campaign finance registration obligations.

82. In *CRTL*, the Tenth Circuit examined a similar provision. In that case, the Tenth Circuit held that a $200 threshold for regulation of speech under campaign finance law was too low. Furthermore, such a threshold could not stand as a proxy for *Buckley*'s "the major purpose" test. *CRTL*, 498 F.3d at 1154.

83. Here, Colorado campaign finance law uses such a proxy to determine a major purpose. *See* C.R.S. § 1-45-103(12)(b)(II)(B) and 8 C.C.R. 1505-6 Rule 1.12.3(b).

84. Furthermore, with the high costs of advertising, any small organization can quickly meet the 30% threshold on written or broadcast communications with the printing of a few flyers or the purchase of a few Internet, radio, or television ads.

85. The effect is that small-scale issue committees such as CSG are unsure at what point they are obliged to bear the burdens of full campaign finance disclosure reporting. This uncertainty is chilling their speech. Therefore, under *CRTL*, the "written or broadcast communication" threshold is unconstitutional, both facially and as-applied to CSG.

COUNT 5
(42 U.S.C. § 1983)
Declaratory Judgment on Definition of "Written or Broadcast Communication"

86. Plaintiff realleges and incorporates by reference paragraphs 1 – 85.

87. Plaintiff is aware of no case that defines or interprets "written or broadcast communication" in the context of C.R.S. § 1-45-103(12)(b)(II)(B) or 8 C.C.R. 1505-6 Rule 1.12.3(b).

88. This lack of clarity becomes a trap for the unwary. Under the current state of the law, it is unclear whether the Public Policy Paper qualifies as a "written communication" or if Facebook advertising constitutes a "broadcast communication" or "written communication" or neither. There must be some conceptual difference in the law between any writing and "written communication," else the term "communication" is superfluous.

89. The vagueness of the "written or broadcast communications" standard prevents groups from speaking out on issues of public policy because the standard can be applied to any communication in written or broadcast form. Such overbreadth chills speech.

90. CSG seeks a declaratory judgment that the term "written or broadcast communication" as found in Colorado law may not be constitutionally applied to any of CSG's activities.

## COUNT 6
(42 U.S.C. § 1983)
Declaratory Judgment on Registration and Disclosure Threshold Limits for Issue Committees

91. Plaintiff realleges and incorporates by reference paragraphs 1 – 90.

92. Article XXVIII § 2(10)(a)(II) provides a $200 threshold limit for reporting and disclosure by issue committees. Once an organization collects contributions or expends $200 in support or opposition to a ballot issue or ballot question, then the organization must register as an issue committee.

93. In *Sampson v. Buescher*, 625 F.3d 1247, 1249 (10th Cir. 2010), the Tenth Circuit Court of Appeals examined the $200 limit found in Article XXVIII § 2(10)(a)(II). In that case, homeowners sought to organize a challenge to the annexation of their neighborhood into the

town of Parker, Colorado. Despite having raised less than $1,000, the homeowners were burdened with the full weight of all Colorado campaign finance disclosure and reporting laws. In that as-applied challenge, the Tenth Circuit found Colorado's disclosure and reporting requirements to be "substantial" burdens on the homeowners' rights to freedom of association under the First Amendment. *Id.* at 1259. Furthermore, the public interest in disclosure was minimal. *Id.* at 1260. Therefore, *Sampson* stands for the assertion that the neighbors' spending of less than $1,000 is too minor to trigger issue committee disclosure and reporting.

94. Recently, the Colorado Secretary of State attempted to promulgate a rule recognizing *Sampson*. The rule sought to set a threshold limit of $5,000, below which contributions and expenditures would not need to be reported.

95. However, the Denver District Court declared the rule invalid as exceeding the Secretary's authority. *Colorado Common Cause v. Gessler*, 2011 C.V. 4164, slip op. at 10 (2d Dist. Nov. 17, 2011) (Order to set aside the Rule and set aside the Secretary of State's counterclaim).

96. Meanwhile, the threshold for disclosure and reporting remains at $200, despite the Tenth Circuit's ruling in *Sampson*. Small-scale issue committees such as CSG are unsure of the point at which they are obligated to bear the burdens of full campaign finance reporting. This uncertainty is chilling their speech.

97. CSG intends to spend no more than $3,500 in 2012. CSG seeks a declaratory judgment that, under *Sampson*'s reasoning, such expenditures are too small to trigger a public interest in CSG's registration or the disclosure of CSG's activities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.  A declaration that the "major purpose" test found at Colorado Constitution Article XXVIII § 2(10)(a), and interpreted by state laws and regulations, is unconstitutionally vague and overbroad in that it allows for organizations with multiple "major purposes" to be regulated as issue committees, in contravention of established federal precedents.

B.  A declaration that Article XXVIII § 2(10)(a), C.R.S. § 1-45-103(12)(b)(II)(A), and 8 C.C.R. 1505-6 Rule 1.12.3(a) are facially vague and overbroad in that they define "expenditures" to cover many forms of speech in which the government has no legitimate interest supporting obligatory registration and disclosure.

C.  A declaration that funds used to create, advertise, and distribute a public policy paper are not "expenditures" under Article XXVIII § 8(a).

D.  A declaration that the press exemption in Article XXVIII § 2(7)(b) and C.R.S. § 1-45-103(12.5) are unconstitutionally vague in that they do not cover public policy papers nor do they address distribution via the Internet.

E.  A declaration that the threshold reporting limit for "written or broadcast communications" under C.R.S. § 1-45-103(12)(b)(II)(B) and 8 C.C.R. 1505-6 Rule 1.12.3(b) are unconstitutionally too low under *Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137 (10th Cir. 2007).

    F.    A declaration that the definition of "written or broadcast communications" under C.R.S. § 1-45-103(12)(b)(II)(B) and 8 C.C.R. 1505-6 Rule 1.12.3(b) does not reach speech such as public policy papers or issue advertising distributed over the Internet.

    G.    A declaration that, following *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir. 2007), CSG's expected activity of $3,500 does not require registration as an issue committee.

    H.    Such injunctive relief as this Court may direct.

    I.    Plaintiffs further seek costs and attorneys' fees under 42 U.S.C. § 1988 and any other applicable statute or authority, and further seek other relief this Court may grant in its discretion.

Respectfully submitted this 2nd day of July, 2012.

/s/ Allen Dickerson
Allen Dickerson
Tyler Martinez
Center for Competitive Politics
124 West Street South
Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Fax: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

Attorneys for Coalition for Secular Government

## VERIFICATION

STATE OF COLORADO )
) ss.
COUNTY OF Arapahoe )

I, DIANA HSIEH, being first duly sworn, state under oath that I am the president of Coalition for Secular Government, a Colorado nonprofit corporation, that I am authorized to execute this VERIFICATION, that I have read the foregoing VERIFIED COMPLAINT, and that the statements contained therein are true and correct to the best of my knowledge, information, and belief.

*DM Hsieh*

Subscribed and sworn before me this 21 day of June, 2012.

*[signature]*
Notary Public
My Commission Expires: 07-15-2012

*[Notary seal: KAREN PERKINS, NOTARY PUBLIC, STATE OF COLORADO, My Commission Expires 07/15/2012]*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of July, 2012, the foregoing document was served on the following, via the electronic and first class mail:

Hon. Scott Gessler
Secretary, Colorado Department of State
1700 Broadway
Denver, Colorado 80290
Phone: 303.894.2200
Fax: 303.869.4861
scott.gessler@sos.state.co.us

Hon. John Suthers
Attorney General of Colorado
1525 Sherman Street
Denver, Colorado 80203
Phone 303.866.4500
Fax: 303.866.5691
attorney.general@state.co.us

s/ Allen Dickerson
Allen Dickerson