**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01708-JLK

COALITION FOR SECULAR GOVERNMENT,      )
a Colorado nonprofit corporation,                          )
                                                                              )
Plaintiff,                                                                  )
                                                                              )
v.                                                                            )
                                                                              )
SCOTT GESSLER,                                                    )
in his official capacity as Secretary of State,            )
                                                                              )
Defendant.                                                              )

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

Plaintiff, Coalition for Secular Government, by and through undersigned counsel, submits its Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction.

Respectfully submitted this 13th day of August, 2012.

/s/ Allen Dickerson

Allen Dickerson
Tyler Martinez
Center for Competitive Politics
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703-894-6800
Facsimile: 703-894-6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

## Table of Contents

Table of Authorities.................................................................................iii

Introduction.......................................................................................1

Facts...............................................................................................1

Argument..........................................................................................4

    I.      CSG has shown a substantial likelihood of success on the merits.............4

        a.  The burden of defending a campaign finance disclosure statute falls squarely on the Secretary of State...............................................4

        b.  Colorado's "a major purpose" test is unconstitutionally overbroad in light of *Buckley*'s "the major purpose" test......................................7

        c.  Laws must be tailored so they do not swallow campaign speech whose content is not unambiguously campaign related..............................12

               i.  The challenged provisions are not sufficiently tailored because they capture CSG's activities, which are not unambiguously campaign related..........................................13

                      1.  Reading Colorado law to include public policy papers within the definition of "express advocacy" is unconstitutional.........................14

                      2.  The Press Exemption does not extend to non-traditional media activities such as those undertaken by CSG, and is therefore unconstitutional....................................................18

        d.  Vague legislation unconstitutionally chills protected activities, since would-be speakers must use an abundance of caution to ensure their behavior is consistent with the law................................20

      i.  Colorado law does not provide guidance as to whether public policy papers like CSG's constitute "express advocacy" for the purposes of triggering full disclosure and reporting requirements.........................................................................22

     ii.  The "written or broadcast communication" provision creates a trap for the unwary and is unconstitutionally vague as applied to CSG...............................................24

    iii.  CSG and others similarly situated cannot tell from the text of Article XXVIII's "Press Exemption" whether protects their speech..........................................................27

   e.  Colorado campaign finance law's $200 threshold ignores the holding of the Tenth Circuit in *Sampson v. Buescher*, the reasoning for which also applies to CSG..........................................................................29

II.     CSG will suffer irreparable harm if this Court does not issue the requested injunction..............................................................30

III.    The harm CSG will suffer absent intervention by this Court outweighs the injury the injunction might cause the Secretary................................................................................31

IV.    A preliminary injunction would not be adverse to the public interest, but rather serves the public interest of defending the political speech rights guaranteed by the First Amendment............................................32

Conclusion........................................................................................34

## Table of Authorities

**Cases**

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999)...........................................31

*ACORN v. Municipality of Golden*, 744 F.2d 739 (10th Cir. 1984)........................4

*Bouie v. City of Columbia,* 378 U.S. 347 (1964)............................................23

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)...............................................7

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................passim

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010)............31

*Citizens United v. FEC*, 130 S. Ct. 876 (2010)......................................passim

*Colorado Common Cause v. Gessler*, 2011 C.V. 4164 (2d Dist. Nov. 17, 2011)..........30

*Colorado Ethics Watch v. Gessler*, 2012CV2133 (Denver Dist. Ct. Aug. 10, 2012)......7

*Colorado Ethics Watch v. Senate Majority Fund*, 269 P.3d 1248 (Colo. 2012)......14, 23

*Colorado Right to Life Committee v. Coffman*,
498 F.3d 1137 (10th Cir. 2007)...............................................9, 10, 26

*Colorado Right to Life Committee v. Davidson*,
395 F. Supp. 2d 1001 (D. Colo. 2005)..............................................26

*Direct Marketing Association v. Huber*,
2012 U.S. Dist. LEXIS 44468 at *29 (D. Colo. Mar. 30, 2012)........................33

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012)............................4

*Doe v. Reed*, 130 S. Ct. 2811 (2010)..................................................5

*Durgin v. Lozano*, No. 2012SA10 (Colo. 2012)........................................2

*Elrod v. Burns*, 427 U.S. 347 (1976)................................................31

*FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007)...........................6, 16, 17

*FEC v. Mass. Citizens for Life*, 479 U.S. 238 (1986)......................................9

*FCC v. Fox TV Stations, Inc.*, 132 S. Ct. 2307 (2012).....................20, 24, 25, 28

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ................6, 18, 33

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)..................................21

*Gooding v. Wilson*, 405 U.S. 518 (1972)........:.........................................13

*Harwood v. Senate Majority Fund*, 141 P.3d 962 (Colo. Ct. App. 2006)..............26

*Independence Institute v. Coffman*, 209 P.3d 1130 (Colo. Ct. App. 2008)..............9

*Keyishian v. Board of Regents*, 385 U.S. 589 (1967)....................................21

*Kolender v. Lawson*, 461 U.S. 352 (1983)................................................21

*Lovell v. City of Griffin*, 303 U.S. 444 (1938)............................................19

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).............................24

*NAACP v. Button*, 371 U.S. 415 (1963)..................................................13

*North Carolina Right to Life v. Leake*, 525 F.3d 274 (4th Cir. 2008)............9, 10, 11

*New Mexico Youth Organized v. Herrera*, 611 F.3d 669 (10th Cir. 2010)...5, 6, 10, 11

*Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005)..............33

*Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010)............................passim

*Speiser v. Randall,* 357 U.S. 513 (1958)..................................................13

*Thomas v. Collins*, 323 U.S. 516 (1945)...................................................13

*United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010)................21

*United States v. Graham,* 305 F.3d 1094 (10th Cir. 2002)..........................21, 23

*United States v. Hunter*, No. 10-3266 (10th Cir. 2011)............................21, 23

*United States v. Power Engineering Co.*,
191 F.3d 1224 (10th Cir. 1999)…………………………………………………4

*United States v. Protex Industries, Inc.*, 874 F.2d 740 (10th Cir. 2010)……..21, 23

*United States v. United Auto Workers*,
352 U.S. 567 (1957)…………………………………………………………32

*United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003)………………………21

*Utah Licensed Bev. Ass'n v. Leavitt*, 256 F.3d 1061 (10th Cir. 2001)……………33

*Virginian Railway Co. v. System Federation*, 300 U.S. 515 (1937)………………33

*Westbrook v. Teton County School District No. 1*,
918 F. Supp. 1475 (D. Wyo. 1996)…………………………………………13

*Yates v. United States*, 354 U.S. 298 (1957)………………………………13

**Statutes, Rules and Constitutions**

U.S. CONST. amend. I………………………………………………………passim

COLO. CONST. art. XXVIII § 2(7)(b)………………………………………..passim

COLO. CONST. art. XXVIII § 2(8)(a)……………………………………….12, 22

COLORADO CONST. art. XXVIII § 2(10)(a)……………………….8, 12, 22, 29

8 C.C.R. 1505-6 Rule 1.12.3………………………………………...passim

8 C.C.R. 1505-6 Rule 4.1.1…………………………………………………29

8 C.C.R. 1505-6 Rule 4.1.2…………………………………………………30

C.R.S. § 1-45-103(10) (2012)………………………………………………12

C.R.S. § 1-45-103(12)(b)(II)(A) (2012)……………………………………12

C.R.S. § 1-45-103(12)(b)(II)(B) (2012)…………………………..12, 25, 26

**Other Authorities**

Michael S. Kang, *The End of Campaign Finance Law*,
98 Va. L. Rev. 1, 10 (2012)...............................................................15

Patrick Malone, "Study Shows Who Breaks Campaign Laws",
Pueblo Chieftain, August 8, 2011....................................................31

Transcript of Oral Argument, *Citizens United v. FEC*,
130 S. Ct. 876 (No. 08-205)............................................................15

## Introduction

Plaintiff Coalition for Secular Government ("CSG") challenges the application of portions of Article XXVIII of the Colorado Constitution, the Colorado Fair Campaign Practices Act ("FCPA"), and the FCPA's implementing regulations promulgated by the Secretary of State. CSG challenges the constitutionality of provisions governing what percentage of political activity requires an organization to register as an Issue Committee, how that percentage is calculated, and what qualifies as political activity for the purposes of that calculation. Furthermore, Colorado's Press Exemption may or may not cover CSG. This challenge is based on the cumulative effect of these overbroad and vague provisions. CSG maintains that all of these provisions are unconstitutional to the extent that each provision subjects CSG to the burdensome registration and reporting obligations of an Issue Committee.

## Facts

CSG is a Colorado nonprofit corporation devoted to promoting a secular understanding of individual rights, including freedom of conscience and separation of church and state. Consistent with this mission, CSG participates in the debate about when personhood rights attach to human life. CSG is not affiliated with any political party or candidate.

CSG maintains a website that receives about 5,000 hits per month. The site features a blog on topics including philosophy, religion, current events, and public policy.

1

This blog is updated 1-3 times per week. The website also occasionally features YouTube videos. CSG maintains a Facebook page with 235 "likes."

In 2008, CSG commissioned the first version of its principal work product to date: a Public Policy Paper ("the Paper") discussing the legal and practical effects of Colorado's 2008 personhood amendment, as well as a philosophical discussion of the morality of abortion. In 2010, the Paper was updated and expanded to mention Colorado's 2010 personhood amendment, Amendment 62, and incorporate a more in-depth discussion of CSG's moral and philosophical arguments for their position on personhood. Today, the Paper is 34 pages long (inclusive of a cover page and excluding 176 endnotes). But it is only in its final seven paragraphs, comprising less than a page, that the Paper substantially discusses the explicit electoral ramifications of voting for or against Amendment 62. Moreover, only the last sentence of the Paper gives any call to action: "If you believe that 'human life has value,' the only moral choice is to vote against Amendment 62."[1]

CSG intends to update and expand this Paper once again, and would like to discuss a similar ballot initiative that, following the Colorado Supreme Court's decision in *Durgin v. Lozano*[2] will likely appear on the 2012 ballot. CSG also wishes to publicize the paper through the use of online advertisements. Such publicity will mirror that used in previous years, and will not represent a preponderance of CSG's budget.

---

[1] Plaintiff's Exhibit 2 at 33.

[2] *Durgin v. Lozano*, No. 2012SA10 (Colo. 2012).

2

In 2008, without advice of counsel or a legal duty to do so, CSG registered as a statewide Issue Committee to publicize the 2008 version of its Paper. This required Dr. Diana Hsieh, CSG's registered agent for the purposes of Colorado campaign finance law, to report the addresses of the U.S. Post Offices and UPS stores where she bought stamps and made photocopies of the Paper.[3] Over its life, the committee collected $200 in monetary contributions and $229.25 in nonmonetary contributions, with Dr. Hsieh as the sole monetary contributor.[4]

In 2010, CSG registered as a new statewide Issue Committee opposing Amendment 62. In October 2010, Dr. Hsieh's house flooded, causing CSG to be one day late filing a committee report. CSG was fined $50, which was only waived after CSG sought administrative relief. In 2010, CSG received a total of $2,951.16 in nonmonetary and monetary contributions. It expended these funds on Facebook advertising, graphic design and layout services, reworking and expanding the Paper, and printing flyers explaining how to obtain copies of the Paper.

During the 2012 election cycle, CSG wishes to act consistent with its purpose. Specifically, it intends to (1) update and expand the Paper, (2) distribute the Paper to the public, and (3) purchase advertising to promote the Paper and its contents. It plans to raise $3,500 or less and to use that money to pay the authors of the Paper and to purchase design services, copy editing, flyers, and online advertising.

---

[3] Plaintiff's Exhibit 3 at 13.

[4] The committee expended $195.52 at Office Max, the Post Office, and the UPS Store. At the termination of the committee, $4.48 was returned to Dr. Hsieh. The Paper was the only product distributed by the issue committee, which terminated on December 4, 2008.

CSG's past experiences attempting to engage in public policy advocacy while registering as an Issue Committee have chilled its speech. Going forward, it seeks an injunction against enforcement of the elements of Colorado law that have unconstitutionally interfered with its protected activities.

## Argument

To obtain a preliminary injunction, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable harm if the injunction were not granted; (3) that the threatened harm outweighs the injury the injunction might cause the opposing party; and (4) that the injunction would not be adverse to the public interest.[5] Each of these four prongs weighs heavily in CSG's favor.

### I.    CSG has shown a substantial likelihood of success on the merits.

#### a.  The burden of defending a campaign finance disclosure statute falls squarely on the Secretary of State.

CSG challenges the Secretary's enforcement of certain provisions of Colorado's campaign finance disclosure regime. Tenth Circuit law is unambiguous: "when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality."[6] And when it comes to "[c]ampaign-disclosure

---

[5] *United States v. Power Eng'g Co.*, 191 F.3d 1224, 1230 (10th Cir. 1999).

[6] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1131 (10th Cir. 2012) (citing *ACORN v. Municipality of Golden*, 744 F.2d 739, 746 (10th Cir. 1984)).

statutes", the Secretary of State must show that the laws "survive exacting scrutiny."[7] The

U.S. Supreme Court has long "recognized that significant encroachments on First

Amendment rights of the sort that compelled disclosure imposes cannot be justified by a

mere showing of some legitimate governmental interest. . . . [the court has] required that

the subordinating interests of the State must survive exacting scrutiny."[8]   Exacting

scrutiny "requires a substantial relation between the disclosure requirement and a

sufficiently important governmental interest."[9]

The Secretary's burden to show that CSG's activities are "unambiguously

campaigned related" is a difficult one. Just two years ago, the Tenth Circuit decided *New*

*Mexico Youth Organized v. Herrera.*[10] There, several organizations, which had mailed

out ads alleging that certain elected officials were beholden to corporate interests,

challenged regulations similar to those at issue here. The Tenth Circuit placed the burden

of exacting scrutiny on the New Mexico Secretary of State[11] and found that the

organizations' activity did not rise to the level of having "the major purpose" of electing

or defeating a candidate for office.[12] In the instant case, CSG's activities are far less

connected to advocating the election or defeat of candidates or ballot measures, and its

---

[7] *Sampson v. Buescher*, 625 F.3d 1247, 1261 (10th Cir. 2010) (citing *Doe v. Reed*, 130 S. Ct. 2811, 2818; *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)).

[8] *Buckley*, 424 U.S. at 64.

[9] *Citizens United v. FEC*, 130 S. Ct. 876, 914 (2010) (internal citations omitted)

[10] *N.M. Youth Organized v. Herrera*, 611 F.3d 669 (10th Cir. 2010).

[11] *Id.* at 676.

[12] *Id.* at 679.

expenditures are similarly small. Furthermore, unlike *Herrera*, the instant case deals with ballot measure committees, not candidate committees. Per *First National Bank of Boston v. Bellotti*, there is no risk of corruption or appearance thereof—it is settled law that ballot measure committees cannot "corrupt" the State's voters.[13]

In *Herrera*, the Tenth Circuit examined *Buckley* and its progeny, and found that regulations could survive "exacting scrutiny" so long as the speech covered was "unambiguously campaign related."[14] The *Herrera* court further found that:

> There are two categories of speech which qualify as unambiguously campaign related… First, speech that expressly advocates or is the functional equivalent of express advocacy for the election or defeat of a specific candidate is unambiguously related to the campaign of a candidate and thus properly subject to regulation regardless of its origination. Second, all expenditures by political committees qualify as unambiguously campaign related and accordingly, political committees may be properly subject to extensive reporting and disclosure requirements.[15]

In this case, the Secretary must show that either CSG's speech is unambiguously campaign related or that there is a substantial relation between Colorado's interests justifying its campaign finance laws and CSG's discussion of public policy and philosophy.

---

[13] Indeed, it is questionable whether the State has any legitimate interest in regulating the speech of a group which confines itself to discussing public issues. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791 (1973) ("The risk of corruption perceived in cases involving candidate elections…simply is not present in a popular vote on a public issue.")

[14] *Herrera* at 676 (citing *Buckley*, 424 U.S. at 79-81).

[15] *Herrera* at 676-77 (citing *FEC v. Wisc. Right to Life*, 551 U.S. 449, 476 (2007) ("*WRTL II*") and *Buckley*, 424 U.S. at 79).

### b. Colorado's "a major purpose" test is unconstitutionally overbroad in light of *Buckley*'s "the major purpose" test.[16]

At issue in this case is the scope and application of Colorado's "a major purpose" test as enforced by the Secretary of State. It is impermissible for a law's reach to be so broad that it inexorably condemns First Amendment protected speech.[17] "To put the matter another way…the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[18]

For reasons explained *infra*, Colorado's campaign finance disclosure regime is based on laws that are vague and overbroad. CSG stipulates that it will spend the majority of its budget on the writing and publication of the Paper. But, in advance of this court's ruling, CSG does not know whether the Paper qualifies as an expenditure or communication in whole, in part, or not at all. Nor does it know if its advertising of the Paper counts as such an expenditure or communication. In order to determine whether

---

[16] Plaintiff is aware of the recent ruling in *Colorado Ethics Watch v. Gessler*, 2012CV2133 (Denver Dist. Ct. Aug. 9, 2012). There, the Secretary's promulgated Rule 1.12.3, finding "a major purpose" for Issue Committees where they spend more than 30 percent of their budgets on expenditures or written or broadcast communications, was declared invalid by the Denver District Court for the State of Colorado. *Id.* at *6. This is, of course, not the final say on the matter, as there will likely be an appeal.

Furthermore, eliminating the 30 percent trigger actually makes things dramatically worse for CSG. Without a clear numerical trigger—and knowing that the State's $200 threshold is unconstitutional under *Sampson*—CSG has no guidance whatsoever as to how Colorado calculates the percentage of spending that will force it to register with the State. If *Colorado Ethics Watch v. Gessler* is upheld on appeal, the law is now more vague, more overbroad, and less constitutional. In many ways, this decision – made, CSG understands, on administrative-law grounds – illustrates the pressing need for a federal determination of the facial validity of Colorado's "a major purpose" test.

[17] *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

[18] *Id.*

CSG must register as an Issue Committee, it does not just need to know how expenditures and communications are calculated. CSG also must know what percentage of its activities must qualify as expenditures or communications before it is pushed across the threshold into mandatory registration.

The Colorado Constitution defines an "Issue Committee," in part, as any person or group of two or more persons that has "a major purpose of supporting or opposing any ballot issue or ballot question."[19] Rules promulgated by the Secretary of State interpret this "a major purpose" test as being satisfied when 30 percent of an organization's annual spending is either on expenditures or communications in "support of or opposition to ballot issues or ballot questions."[20] Depending on the scope of the definition of "express advocacy", "expenditure", "communication", and "Issue Committee", it is conceivable that CSG may end up spending more than 30 percent—but less than a majority—of its budget on expenditures and communications.

Colorado's "a major purpose" test is unconstitutional, as it gathers otherwise protected quantities of speech. Under the State's rules, regulated organizations may have multiple major purposes. This is not only grammatically unsound, it is constitutionally infirm.

The proper test for determining whether or not an organization has transmuted into an Issue Committee is not the "a major purpose" test laid out by the Colorado Constitution and the Secretary, but rather "the major purpose test" mandated by the U.S.

---

[19] COLORADO CONST. Art. XXVIII § 2(10)(a).

[20] C.C.R. 1505-6 Rule 1.12.3.

8

Supreme Court and applied by the Tenth Circuit.[21] Organizations with *the* major purpose of engaging in what is "by definition, campaign related" activity may be forced to register as Issue Committees.[22] There are two avenues for determining an organization's "major purpose": "(1) examination of the organization's central organizational purpose; or (2) comparison of the organization's independent spending with overall spending to determine *whether the preponderance of expenditures* are for express advocacy or contributions to candidates."[23]

*The* major purpose test—as its name implies—excludes the possibility of multiple major purposes. Colorado has treated the major purpose test as optional,[24] but it is not:

---

[21] *Buckley*, 424 U.S. at 79; *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 252 n. 6, 262 (1986); *Colorado Right to Life Committee, Inc. v. Coffman*, 498 F. 3d. 1137, 1152-53 (10th Cir. 2007) (*CRTL*).

[22] *Buckley* at 79.

[23] *CRTL* at 1152.

[24] *See Independence Inst. v. Coffman*, 209 P.3d 1130, 1134 (Colo. Ct. App. 2008) (holding that the "a major purpose" language in Article XXVIII was neither facially overbroad nor facially vague). However, the state court's ruling was made without the current administrative rule of 30 percent of expenditures found in 8 C.C.R. 1505-6 Rule 1.12.3(a), which easily allows for multiple "major purposes."

Furthermore, the court in *Independence Institute* relied upon the dissent in *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 315 (4th Cir. 2008) (*NCRL*) (Michael, J., dissenting). The majority in *NCRL* came to the opposite conclusion. *Id.* at 287. ("[T]he Court in Buckley must have been using "the major purpose" test to identify organizations that had the election or opposition of a candidate as their only or primary goal -- this ensured that the burdens facing a political committee largely fell on election-related speech, rather than on protected political speech.")

Finally, in *Citizens United*, the Supreme Court stated that "[p]rolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at [the law's] meaning and differ as to its application." *Citizens United v. FEC*, 130 S. Ct. 876, 889 (2010) (internal quotation marks and citation omitted). Knowing the major purpose (majority) of

9

"the 'major purpose' test…sets the lower bounds for when a regulation as a political committee is constitutionally permissible."[25] Thus, the test serves as a floor on the ability of the State to force organizations to comply with onerous regulations in order to speak. Any "alternate rule would 'threaten[] the regulation of too much ordinary political speech to be constitutional.'"[26]

On two separate occasions, the Tenth Circuit specifically recognized the mandatory nature of the major purpose test. In 2007, the Colorado Secretary of State suggested that it was a "flawed assumption" to hold "that the major purpose component is constitutionally compelled by *Buckley*."[27]  Therefore, the Secretary argued, the State could enforce a mandate that "any group that spends more than $200 a year to support or oppose the nomination or election of one or more candidates [become]…subject to the State's various administrative, organizational, and reporting requirements."[28] The Tenth Circuit responded by affirming that "*Buckley*'s 'major purpose test' is left unaltered" and that "the $200 trigger, standing alone, cannot serve as a proxy for the 'major purpose' test as applied."[29] Similarly, in 2010, the Tenth Circuit held that a $500 trigger to register as a

---

an organization is clear. In contrast, the possibility of multiple major purposes based on a 30 percent threshold sweeps in too much protected speech and is therefore overbroad.

[25] *Herrera* at 677-678.

[26] *Id.* at 678 (quoting *NCRL*, 525 F.3d at 289).

[27] *CRTL* at 1153.

[28] *Id.*

[29] *Id.*

New Mexico political committee was unconstitutional as applied.[30] The court pointedly noted that "there is no indication that either group spends a *preponderance of its expenditures* on express advocacy or contributions to candidates."[31]

If "[a] single organization can have multiple 'major purposes'...imposing political committee burdens on a multi-faceted organization may mean that [Colorado] is regulating a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech."[32] With the high costs of advertising, any small organization can quickly meet the 30 percent threshold on expenditures or communications with the purchase of a few Facebook ads and the costs of disseminating a paper.

Because other provisions of Colorado's campaign finance regime are vague or overbroad as applied to CSG, as discussed *infra*, CSG believes, based on the outcome of this case, that it may be in a position where it does not have "the major purpose" of supporting or opposing ballot measures because it does not spend the preponderance of its expenditures on express advocacy. But the current rules promulgated by the Secretary, with a much lower standard of 30 percent, could give CSG *a* major purpose of opposing ballot measures. In that case, the State's "a major purpose test" would sweep in CSG's otherwise protected First Amendment speech. Thus, dispensing with the *Buckley* preponderance standard sweeps organizations into Colorado's regime of campaign

---

[30] *Herrera* at 679.

[31] *Id.* at 678 (emphasis added).

[32] *NCRL* at 289.

finance regulation that it may not constitutionally regulate. Furthermore, Article XXVIII § 2(10)(a) does not put organizations on notice as to when they become Issue Committees and must register, inevitably chilling speech. Therefore, Article XXVIII § 2(10)(a) is facially unconstitutional.

CSG asserts that, in addition to its facial unconstitutionality, Article XXVIII's "a major purpose" test is also unconstitutional as applied to CSG. This is because the test operates in conjunction with other vague and overbroad provisions of Colorado law, as discussed *infra*. These interactions make it impossible for CSG to adequately divine the line between regulated and unregulated speech, as well as the point at which engaging in speech subject to regulation requires an organization to register as an Issue Committee.

### c. Laws must be tailored so they do not swallow campaign speech whose content is not unambiguously campaign related.

No matter whether *Buckley*'s "the major purpose test" or Colorado's lower "a major purpose" test is applied in determining committee status, the law must be properly tailored to avoid chilling speech. The percentages for either test are based on spending for "expenditures." Under Colorado law, expenditures are any purchase, payment, distribution, loan, advance, deposit, or gift of money made to 'expressly advocate' for or against a ballot initiative.[33]  Also, "a major purpose" may be found based upon spending for "written or broadcast communications."[34] However, neither definition can be so broad as to encompass works like a public policy paper. This uncertainty on the law's breadth

---

[33] C.R.S. § 1-45-103(12)(b)(II)(A) (2012), 8 C.C.R. 1505-6 Rule 1.12.3(a); *see also* C.R.S. § 1-45-103(10) (2012) and COLO. CONST. art. XXVIII § 2(8)(a) (defining "expenditure").

[34] C.R.S. § 1-45-103(12)(b)(II)(B) (2012), 8 C.C.R. 1505-6 Rule 1.12.3(b).

of coverage is chilling CSG's speech. Colorado law does provide for a press exemption, but the exemption fails to capture public policy papers and therefore Colorado's laws calculating an organization's "major purpose" are unconstitutionally overbroad.

> i.  **The challenged provisions are not sufficiently tailored because they capture CSG's activities, which are not unambiguously campaign related.**

Regardless of which major purpose test is used, the definition laying out the scope of activity covered must be tailored to survive exacting scrutiny. The "line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished…[must be] finely drawn."[35] As a sister district court has noted, "[s]uch precision is necessary because laws that ostensibly regulate only unprotected speech may, as a result of sweeping language or imprecise words, have a spillover effect" and could be interpreted as prohibiting otherwise protected activities.[36]  Such uncertainty puts speakers in the position of choosing between engaging in First Amendment speech or risking running afoul of the authorities. Such a choice chills speech, and cannot be constitutional. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."[37]

---

[35] *Speiser v. Randall,* 357 U.S. 513, 525 (1958); (citing *Thomas v.Collins*, 323 U.S. 516 (1945) and *Yates v. United States*, 354 U.S. 298 (1957)).

[36] *Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. 1475, 1485 (D. Wyo. 1996) (citing *Gooding v. Wilson*, 405 U.S. 518, 533 (1972) (Statutes 'must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.'")).

[37] *Button*, 371 U.S. at 433.

This choice is CSG's dilemma in the instant case, and as a result, the challenged provisions have an unconstitutional chilling effect. Most obviously, this is so because it is not even clear whether CSG is subject to these registration and reporting requirements. CSG worries that too much politically related activity might render it subject to the registration and reporting requirements at issue here and to substantial penalties should it run afoul of those requirements.

**1. Reading Colorado law to include public policy papers within the definition of "expenditure" is unconstitutional.**

CSG has a substantial likelihood of showing that Colorado's definition of expenditure is so improperly tailored that it unconstitutionally captures protected First Amendment activities, no matter which major purpose test is used. Colorado does not define speech as an "expenditure" unless that speech contains the *Buckley* "magic words" of "express advocacy" or their equivalent.[38] CSG stipulates that one sentence of its Paper directly recommends against a vote for Amendment 62. However, *Buckley*'s 'magic words' are not enough: Colorado must ensure that speakers who offer only a minimal quantum of advocacy will not face the full force of the campaign finance disclosure regime.[39] Until CSG, and similarly situated organizations know just what that quantum is, speech that mentions campaigns will stay on the sidelines.

During the first argument for the *Citizens United* case, the government's attorney stated that "a 500-page book, and at the end it says, and so [vote] for X" could be

---

[38] *Colorado Ethics Watch v. Senate Majority Fund*, 269 P.3d 1248, 1255 (Colo. 2012).

[39] *See Citizens United,* 130 S. Ct. at 904; *cf. Citizens United* at 928 fn. 6 (Roberts, CJ, concurring).

prohibited under the Federal express advocacy provisions.[40] It was the prospect of banning books based on a single sentence of "express advocacy" that brought the case to a rehearing and further briefing.[41] In the *Citizens United* opinion, the Court remarked that "[t]his troubling assertion of brooding governmental power cannot be reconciled with the confidence and stability in civic discourse that the First Amendment must secure."[42]

The *Citizens United* Court did not determine what quantum of express advocacy transforms a discussion of issues into a political communication that may be regulated by the state. But such a line must exist.

*Buckley* famously held that a definition of "expenditure" that reached discussion of issues, or which required groups that engaged in such speech to register as political committees, was unconstitutional.[43] Consequently, the government was permitted to regulate only those "communications that in express terms advocate the election or defeat of a clearly identified candidate," and to regulate only groups that made such communications.[44]

*Buckley's* reasoning is applicable here. While the Paper mentions a particular ballot initiative, it clearly does so in the context of a discussion of issues, and not the other way around. As the Court noted:

---

[40] Transcript of Oral Argument at 29, *Citizens United v. FEC*, 130 S. Ct. 876 (No. 08-205), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/08-205.pdf.

[41] Michael S. Kang, *The End of Campaign Finance Law*, 98 Va. L. Rev. 1, 10 (2012).

[42] *Citizens United* at 904.

[43] *Buckley* at 44.

[44] *Id.*

> "[T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest...."[45]

Similarly, ballot initiative "campaigns themselves generate issues of public interest."[46] But this does not mean that all discussion of issues that note this fact, or the relevance of a ballot question to a philosophical conclusion, are themselves express advocacy.

It is true that the state may also regulate the "functional equivalent of express advocacy" in certain circumstances. But a consideration of the Chief Justice's controlling opinion in *FEC v. Wisconsin Right to Life* shows why a small quantum of express advocacy in the context of a larger discussion of issues provides the state with insufficient interest to justify regulation.[47]

As a matter of law, where communications "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate... they are not the functional equivalent of express advocacy."[48] The same may be said of ballot initiatives. On its face, CSG's Paper may reasonably be interpreted as a discussion of philosophical issues and not as an appeal to vote.

---

[45] *Id.* at 42.

[46] *Id.*

[47] *FEC v. Wisc. Right to Life*, 551 U.S. 449 (2007) (*WRTL II*).

[48] *Id.* at 476.

Plaintiff believes that this point is self-evident. But if the Court is unconvinced, *WRTL II* asks it to examine the four corners of Plaintiff's Paper and consider the "indicia" indicating whether the Paper is express advocacy.[49] While the facts of this case are different from those in *WRTL II,* the principle remains. The indicium of express advocacy is a single sentence in the Paper. The indicia of issue discussion are the remainder. No reasonable person can interpret the Paper, on balance, as the "functional equivalent of express advocacy,"[50] and "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor."[51]

While the Paper certainly takes strong philosophical positions, only seven *paragraphs* of the paper's 33 substantive *pages* contain a specific discussion of voting for or against Amendment 62. And only one sentence contains an explicit call to action: "If you believe that 'human life has value,' the only moral choice is to vote against Amendment 62."

Under Colorado law today, this Public Policy Paper may be considered express advocacy and funds spent producing it may be expenditures. Such a result is unconstitutionally overbroad. Colorado's definition of expenditure also provides no clarity on this point, and consequently chills speech. In *Citizens United*, the Supreme Court explained that "the First Amendment does not permit laws that force speakers to

---

[49] *Id.* at 470.

[50] *Id.* at 471.

[51] *Id.* at 474.

retain a campaign finance attorney."[52] The freedom of speech can only flourish when the speakers do not fear restraint or subsequent punishment from burdensome regulation.[53] The State may only regulate speech that reaches a certain quantum of express advocacy. Without declaring exactly what that quantum is, Plaintiff asserts that one sentence of express advocacy in a philosophical treatise on when rights attach is inherently insufficient.[54]

### 2. The Press Exemption excludes non-traditional media such as CSG, and is therefore unconstitutional.

CSG has a substantial likelihood of success in showing that the Press Exemption found at Article XXVIII § 2(7)(b) is not appropriately tailored, as it fails to include organizations with indicia of non-traditional media. Indeed, the statute specifically exempts "news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party"[55] from disclosure and reporting requirements. It makes no allowance, however, for the so-called "new" or "non-traditional media" such as blogs, Twitter accounts, and the like.

---

[52] *Citizens United* at 889.

[53] *Bellotti* at 776 , *cf. Citizens United* at 895 ("Third is the primary importance of speech itself to the integrity of the election process. As additional rules are created for regulating political speech, any speech arguably within their reach is chilled").

[54] *Citizens United* at  904.

[55] COLO. CONST. art. XXVIII § 2(7)(b).

As the Supreme Court pointed out in 1938, "[t]he liberty of the press is not confined to newspapers and periodicals."[56] No doubt the modern Court would be troubled by laws that only extend protection to "newspaper[s], magazine[s]…periodical[s] …[or] broadcast facilit[ies]," all of which might be considered the 'institutional' or 'traditional' press.[57] But as that same Court said, "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."[58] The Press Exemption otherwise sweeps in CSG's activities, which bear all of the characteristics of protected press, yet are still barred from speaking without garnering pre-approval by the Secretary.

CSG maintains a blog which is updated regularly with postings of interest to its members. These include regularly links to Dr. Hsieh's "Philosophy in Action" radio show, which discusses current events, re-posted political cartoons, and a "Publications" section which links to the organization's op-eds, letters to the editor, media releases, and policy papers.[59] CSG participates in many of the common media functions clearly protected by the Press Exemption, yet is not directly shielded by it. As the Supreme Court noted in *Citizens United*, "[s]ubstantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those

---

[56] *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

[57] COLO. CONST. art. XXVIII § 2(7)(b)(I)-(II).

[58] *Lovell* at 452.

[59] The CSG website is available at: http://www.seculargovernment.us/.

differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux."[60] CSG's Web-based presence certainly qualifies.

Therefore, CSG has a substantial likelihood of showing that the Press Exemption is unconstitutional as applied to CSG, as it discriminates against non-traditional media sources.

### d. Vague legislation unconstitutionally chills protected activities, since would-be speakers must use an abundance of caution to ensure their behavior is consistent with the law.

The State's definitions of "express advocacy" and "written or broadcast communication" do not provide clarity for groups like CSG to engage in public policy discussion without potentially running afoul of Colorado's campaign finance laws. This uncertainty chills CSG's speech. Again, Colorado law does provide for a press exemption, but the exemption fails to explicitly cover public policy papers and new media. Therefore the law is void for vagueness.

The void for vagueness doctrine is based on "at least two connected but discrete due process concerns: [r]egulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."[61]

The Tenth Circuit follows the same "void for vagueness" standard that the Supreme Court has articulated multiple times. The standard is simply that the law be

---

[60] *Citizens United v. FEC*, 130 S. Ct. 876 at 890.

[61] *FCC v. Fox TV Stations, Inc.,* 132 S. Ct. 2307, 2309 (2012).

drafted with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[62] Entities must have "fair warning" of the law's requirements.[63] The Tenth Circuit presumes that a statute complies with federal due process unless the court finds, beyond a reasonable doubt, that the legislature exceeded its constitutional authority.[64]

Rights guaranteed by the First Amendment are subject to the strictest of protections under the "void for vagueness" doctrine.[65] There are several factors that contribute to vagueness which are relevant here. These factors include: regulation "lacking terms subject to objective measure…prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules."[66] Moreover, the relevant terms should have some settled use in law.[67]

The potential for discriminatory enforcement is particularly relevant in a void for vagueness analysis:

> "The prohibition against vague regulations of speech is based in part on the
> need to eliminate the impermissible risk of discriminatory enforcement, for

---

[62] *United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011) (citing *United States v. Graham*, 305 F.3d 1094, 1105 (10th Cir. 2002)). *See also, Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 688 (10th Cir. 2010).

[63] *United States v. Protex Indus., Inc.*, 874 F.2d 740, 743 (10th Cir. 1989).

[64] *United States v. Welch*, 327 F.3d 1081, 1094 (10th Cir. 2003).

[65] *See, e.g., Keyishian v. Board of Regents*, 385 U.S. 589, 604 (1967).

[66] *Id.*

[67] *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-49 (1991).

history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law. The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility."[68]

### i. Colorado law does not provide guidance as to whether public policy papers constitute "express advocacy" for the purposes of triggering full disclosure and reporting requirements.

There is a substantial likelihood that CSG will succeed on the merits of its vagueness challenge to the State's use of the term "express advocacy," because of the inexorable relationship between "expenditure,"[69] "express advocacy"[70] and a regulated "Issue Committee"[71] under the State's law. Whether something constitutes an "expenditure" depends on whether it "expressly advocates."[72] It is this act of making "expenditures" that defines an organization's "major purpose" as the support or opposition of a ballot question or ballot initiative. This major purpose, in turn, transforms an entity into an Issue Committee subject to the State's disclosure and reporting requirements.

But the current statutory scheme does not contain a definition of "express advocacy," and therefore does not give would-be speakers "fair warning" of what

---

[68] *Id.* at 1051 (citations omitted).

[69] COLO. CONST. art. XXVIII § 2(8)(a).

[70] COLO. CONST. art. XXVIII § 2(10)(a).

[71] COLO. CONST. art. XXVIII § 2(10)(a).

[72] Article XXVIII § 2(8)(a) defines "expenditure" as: "any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of *expressly advocating* the election or defeat of a candidate or supporting or opposing a ballot issue or ballot question." (emphasis added).

conduct is regulated. Indeed, it is at best unclear whether CSG can promote its Paper without having to register with the State, particularly via the non-traditional means by which it wishes to do so.[73] The Colorado Supreme Court has ruled on the meaning of "express advocacy" for the purposes of election or defeat of a candidate, but not support or opposition of a ballot issue.[74] And even this definition gives little guidance in the context of CSG's desire to purchase ads on Facebook publicizing their paper. Indeed, the current law does not give "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[75]

Furthermore, the lack of a definition for "express advocacy" means that CSG is uncertain as to whether or not some portions of the Paper, the whole Paper, or none of the Paper qualifies as express advocacy. Knowing whether or not its activities qualify as express advocacy would provide CSG with a clear understanding of its rights and responsibilities under the law, specifically, whether or not it must register with the State.

CSG must know what percentage of its spending on the Paper counts toward its "major purpose." It seems absurd, as the law could currently be construed, that if CSG includes no express advocacy in its paper, none of the costs go toward its "major purpose", but if it tacks a single expressive sentence on at the end, the entire cost of the

---

[73] *See, e.g., Protex* at 743 (citing *Bouie v. City of Columbia,* 378 U.S. at 352).

[74] In *Senate Majority Fund* at 1259, the court found that "[e]xpressly advocating the election or defeat of a candidate" as that phrase is used in the definition of "expenditure" in subsection (8)(a) "as limited to speech that explicitly advocates for the election or defeat of a candidate through the use of the 'magic words' set out in *Buckley* or substantially similar synonyms."

[75] *Hunter* at 1141 (citing *Graham* at 1105).

paper goes toward that major purpose. This puts many groups that have no intention of operating as Issue Committees in danger of accidentally being swallowed by the statute. All that is needed is for one staffer to unintentionally cross the express advocacy line in a blog post, and suddenly the entire expense of a website could be attributed toward an organization's "major purpose." This cannot be the law.

The Supreme Court has held that "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent."[76] And yet, in Colorado, the authors of this public policy Paper—a far less immediately electoral document than Mrs. McIntyre's famed handbills backed by "Concerned Parents and Tax Payers"[77]—do not know whether or not the Paper and the means of disseminating it are "expenditures."

It is paramount that "[r]egulated parties...know what is required of them."[78] Therefore, CSG has shown that it is likely to prevail on the merits of its claim that Colorado's express advocacy provisions are unconstitutionally vague as applied to CSG.

### ii. The "written or broadcast communication" provision creates a trap for the unwary and is unconstitutionally vague as applied to CSG.

In the context of Colorado's "major purpose" test, a group is considered an "Issue Committee" if more than 30 percent of its total spending is dedicated to the production or funding of "written or broadcast communications" supporting or opposing a ballot issue

---

[76] *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

[77] *Id.* at 337.

[78] *FCC v. Fox,* 132 S. Ct. at 2317.

or ballot question.[79] The statute does not, however, define "written or broadcast communication." Here CSG's strategy for publicizing its Paper will involve just one kind of paid advertising: Internet ads on Facebook. In light of its modest budget, whether or not Facebook ads linking to the Paper constitute "written or broadcast communications" may well be dispositive in determining whether CSG is, indeed, an Issue Committee under Colorado law.

Even outside the statute at issue, there is very little in Colorado or federal precedent defining either written communications or broadcast communications. Specifically, there are no cases that define or interpret "written or broadcast communication" in the context of papers issued by groups like CSG. Facially, the language of C.R.S. § 1-45-103(12)(b)(II)(B) and 8 C.C.R. 1505-6 Rule 1.12.3(b) appears to encompass many forms of communication. This overbroad definition chills speech because it is vague as to whether and to what extent it applies to areas beyond traditional election advertisements. Moreover, as noted previously, vagueness in the context of speech is particularly dangerous because it can chill the speech.[80] As the Supreme Court recently stated in *FCC v. Fox*, laws must give notice to regulated parties and be precise enough to avoid arbitrary enforcement, otherwise they are vague.[81]

---

[79] 8 C.C.R. 1505-6 Rule 1.12.3(b).

[80] *Fox* at 2317. ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech").

[81] *See Id.* (vagueness doctrine is based on "at least two connected but discrete due process concerns: [r]egulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way") (citations omitted).

Due to its concern about compliance with the law, CSG sought guidance elsewhere. In examining "electioneering communication"[82] under Article XXVIII § 2(7)(a), the Colorado Court of Appeals used the dictionary definitions of "communication" as "the act or action of imparting or transmitting: facts or information communicated; interchange of thoughts or opinions."[83] In another case, this Court combined the press exemption with the definition of written communications:

> [A]lthough there are applications on the fringe for which it is not clear whether communications would be excluded, for the most part, a person of ordinary intelligence understands what communications constitute "news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party."[84]

The majority of CSG's budget will be spent writing and updating the Paper. There must be some legal difference between *any* writing and a "written communication," else the term "communication" is superfluous. But given the lack of guidance, CSG cannot determine what constitutes a written or broadcast communication under C.R.S. § 1-45-103(12)(b)(II)(B) and Rule 1.12.3(b).

This lack of clarity becomes a trap for the unwary. Under this regime, it is unclear whether a public policy paper qualifies as a written communication, and if Facebook advertising constitutes broadcast communication, written communication, or neither. And

---

[82] The Paper is not electioneering communication because it does not refer to a candidate. As neither the statute nor rule define "communication" in the ballot issue context, we look for analogous reasoning from cases discussing electioneering communications.

[83] *Harwood v. Senate Majority Fund*, 141 P.3d 962, 964-965 (Colo. Ct. App. 2006) (citations omitted).

[84] *Colorado Right To Life Committee v. Davidson*, 395 F. Supp. 2d 1001, 1018 (D. Colo. 2005), *aff'd sub nom. CRTL* at 1137 (quoting COLO. CONST. art. XXVIII § 2(7)(b)(I)).

because of this uncertainty as to what exactly constitutes a "written or broadcast communication," potential speakers are left without guidance. If a PDF downloaded over the Internet is a broadcast communication, or the mailing of the Public Policy Paper is a written communication, then what else may be swept in? Inevitably, small-scale Issue Committees such as CSG are left without guidance as to the point at which they are obliged to bear the burdens of full campaign finance reporting.

CSG has not found any guidance on the definition of "written or broadcast communication" in the Colorado Constitution, Colorado Revised Statutes, the Secretary's rules, or case law. The vagueness of the "written or broadcast communications" standard prevents CSG from speaking out on issues of public policy. Therefore, CSG will likely prevail in showing that the "written or broadcast communication" language found at 8 C.C.R. 1505-6 Rule 1.12.3(b) is unconstitutional as applied to its activities.

### iii. CSG and others similarly situated cannot tell whether Article XXVIII's "Press Exemption" protects their speech.

Article XXVIII § 2(7)(b), the Press Exemption, exempts news articles, editorial endorsements, letters to the editor, opinion or commentary writings, editorial endorsements or opinions aired by broadcast facilities from registration and reporting requirements,[85] but leaves an unconstitutionally large range of activity not mentioned in the exemption.

The Press Exemption's protection for "commentary writings" from "periodical[s] not owned or controlled by a candidate or political party" excludes too much. Academic

---

[85] COLO. CONST. art. XXVIII § 2(7)(b).

organizations of all philosophical worldviews and beliefs independently research and comment on public policy issues. In this case, CSG simply developed a policy paper which philosophically opposed codifying personhood rights in the unborn. And the authors concluded that those who agreed with the Paper could not logically support personhood amendments on the ballot in Colorado.

Plaintiff's case highlights the problematic vagueness of the Press Exemption. The statute protects "commentary writings" from "periodical[s] not owned or controlled by a candidate or political party." CSG is not owned or controlled by a candidate or political party, but there is no definition of "commentary" in the text of the Press Exemption. This leaves it unclear where CSG's publication—as well as the pronouncements of other non-party speakers (like think tanks and academics)—falls for the purposes of Colorado's campaign finance regime.

This uncertainty simply does not demonstrate the "precision and guidance" demanded by the Supreme Court.[86] "[W]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."[87] By leaving its speech in a legal limbo, the State has put CSG and organizations like it in the uncomfortable, and unlawful, position of either opening themselves up to enforcement proceedings or opening themselves (and their donors' addresses) to the State. Therefore, CSG will likely succeed on the merits of its void for vagueness challenge to Colorado's Press Exemption.

---

[86] *Fox* at 2317.

[87] *Id.*

   **e.  Colorado campaign finance law's $200 threshold ignores the holding of the Tenth Circuit in *Sampson v. Buescher*, the reasoning for which also applies to CSG.**

Even if CSG fails on all of its other claims, it has a substantial likelihood of showing that the Issue Committee registration requirements of Article XXVIII § 2(10)(a)(II) are not properly tailored.

In *Sampson v. Buescher*, the Tenth Circuit examined the $200 trigger found in Article XXVIII § 2(10)(a)(II).[88] In that case, homeowners sought to organize a challenge to the annexation of their neighborhood into the town of Parker, Colorado.[89] Despite having raised less than $1,000, the homeowners were burdened with the full weight of all Colorado campaign finance disclosure and reporting laws.[90] In that as-applied challenge, the Tenth Circuit found the burdens of disclosure and reporting to be "substantial" against the homeowners' right to freedom of association under the First Amendment.[91]

Recently, the Secretary attempted to promulgate a rule recognizing *Sampson*. The rule sought to set a threshold limit of $5,000, below which contributions and expenditures need not be reported.[92] Once the $5,000 contribution or expenditure threshold was reached, then the Issue Committee would start with that number as the "beginning

---

[88] *Sampson* at 1249.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 1259.

[92] 8 C.C.R. 1505-6 Rule 4.1.1.

balance" for the purposes of campaign finance reporting.[93] But the Denver District Court declared the rule invalid as beyond the Secretary's authority to promulgate.[94] That district court ruling is currently on appeal before the Colorado Court of Appeals.[95] Yet regardless of that ruling, an appeal to the Colorado Supreme Court can be expected. Furthermore, the $200 trigger will remain on the books, and the Secretary or his successor may change the rule at any time.

The threshold for disclosure and reporting remains at the $200 default, despite the Tenth Circuit's ruling in *Sampson*. CSG does not know the trigger that would force registration. Therefore, CSG has a substantial likelihood of showing that the $200 registration threshold is not properly tailored, and that its expected budget of $3,500 is not sufficient to trigger state regulation under the rationale announced in *Sampson*.

## II.   CSG will suffer irreparable harm if this Court does not issue the requested injunction.

The First Amendment is foundational to our political process, so abridgment of the freedom of speech is particularly harmful in the context of discourse about public policy issues. Without an injunction, CSG will be forced to register as an Issue Committee with the State before it writes, publishes, and disseminates an updated Paper. Registering as an Issue Committee will subject CSG to burdensome disclosure requirements that must be followed, lest the Committee run afoul of a State's enforcement action. These fines and

---

[93] 8 C.C.R. 1505-6 Rule 4.1.2.

[94] *Colorado Common Cause v. Gessler*, 2011 C.V. 4164, slip op. at 10 (2d Dist. Nov. 17, 2011) (Order to set aside the Rule and set aside the Secretary of State's counterclaim).

[95] *See* Defendant's Notice of Related Cases, Docket No. 6.

penalties are very real; CSG was assessed a fine for being a day late with a committee filing because Dr. Hsieh's house flooded. Indeed, the Secretary of State's own analysis of Colorado law found that fines were overwhelmingly levied against small, grassroots groups.[96]

The Supreme Court has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[97] Forcing CSG to register with the State, even if such registration proves to be only temporary, constitutes just such an irreparable injury. Similarly, declining to speak in the face of unlawful registration requirements also constitutes irreparable injury.

### III. The harm CSG will suffer absent intervention by this Court outweighs the injury the injunction might cause the Secretary.

This case is based upon the First Amendment freedom of speech, and a threatened injury to a plaintiff's "constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional statute."[98] Absent intervention by this Court, CSG will again, in fear of arbitrary enforcement of Colorado's campaign finance regime, register and report as an

---

[96] Patrick Malone, "Study Shows Who Breaks Campaign Laws", *Pueblo Chieftain*, August 8, 2011. Available at: http://www.chieftain.com/news/local/study-shows-who-breaks-campaign-laws/article_9cf187fc-c185-11e0-baff-001cc4c002e0.html?mode=story. (quoting the Secretary: "And the bottom line is this: Volunteers and grass-roots groups are far more likely to run afoul of the law because the law is so complex. Large, big-money groups are able to hire attorneys and accountants and pay very, very few fines.").

[97] *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (internal citations omitted).

[98] *ACLU v. Johnson*, 194 F.3 1149, 1163 (10th Cir. 1999) (quoting lower court holding in same case).

Issue Committee, despite being unable to assess whether it truly is such a Committee due to the vagueness of Colorado's statutory scheme. And while this case involves the very real and important rights the First Amendment guarantees, it examines only a small portion of campaign finance law: the amount of money a small organization may spend to advance a particular view with only fleeting mention of a ballot question, wholly apart from discussing any political parties or candidates. Thus, while the public interest in upholding CSG's speech rights is great, the relative impact on the administration of Colorado's campaign finance laws is slight, and the balance of harms favors the Plaintiff.

Furthermore, the State has indicated that it will be unable to conduct a trial on the merits of CSG's claim at any time before the November 2012 election.[99] CSG plans to publish its Paper in advance of November, so as to assure itself of maximum potential readership in light of the likely ballot measure discussing personhood.

### IV.   A preliminary injunction would not be adverse to the public interest, but rather serves the public interest of defending the political speech rights guaranteed by the First Amendment.

While a preliminary injunction is an extraordinary remedy, courts may "go much farther" in granting relief when a public (as opposed to private) interest is at stake.[100] Since no party has an interest in the enforcement of an unconstitutional law, the public interest is best protected by issuing a preliminary injunction.[101] And, as the Tenth Circuit

---

[99] Telephone Conversation between Allen Dickerson and Maurice Knaizner (August 10, 2012).

[100] *Virginian Ry. Co. v. System Federation*, 300 U.S. 515, 552 (1937) (citations omitted).

has held in a previous case dealing with the requirements for a preliminary injunction,

"[v]indicating First Amendment freedoms is clearly in the public interest."[102]

Furthermore, the public will be affirmatively harmed if an injunction is not granted, since CSG may choose not to speak. "The self-expression of the communicator is not the only value encompassed by the First Amendment. One of its functions, often referred to as the right to hear or receive information, is to protect the interchange of ideas. Any communication of ideas, and consequently any expenditure of funds which makes the communication of ideas possible, it can be argued, furthers the purposes of the First Amendment."[103] Stifling CSG not only harms the organization, stifling CSG harms the public by preventing them from hearing CSG's message. "First Amendment rights are part of the heritage of all persons and groups in this country."[104]

Consequently, the public interest prong of the preliminary injunction test has been met.

---

[101] *Direct Mktg. Ass'n v. Huber*, 2012 U.S. Dist. LEXIS 44468 at *29 (D. Colo. Mar. 30, 2012) ("When considering an injunction against a law that has been found to be unconstitutional, the balance of harms and public interest considerations largely collapse into each other…Colorado…does not have a legitimate interest in enforcing a law that is unconstitutional. Moreover, 'the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.'") (quoting *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)).

[102] *See, e.g. Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) (citing *Utah Licensed Bev. Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001).

[103] *Bellotti* at 806-807 (White, J.; dissenting).

[104] *United States v. UAW-CIO*, 352 U.S. 567, 581 (1957).

## Conclusion

CSG's request for a preliminary injunction should be granted. CSG has shown a substantial likelihood of success on the merits of its claims, that it would suffer irreparable harm in the absence of an injunction, that the Secretary would suffer no such harm, and that an injunction protecting CSG's speech rights would not be adverse to the public interest.

Respectfully submitted this 13th day of August, 2012.

/s/ Allen Dickerson
Allen Dickerson
Tyler Martinez
Center for Competitive Politics
124 W. West Street, Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

On the 10th day of August, 2012, counsel for CSG conferred with counsel for Secretary Gessler telephonically regarding this Motion for Preliminary Injunction per D.C.Colo.LCivR 7.1. Counsel for Secretary Gessler oppose this Motion for Preliminary Injunction.

/s/ Allen Dickerson
Allen Dickerson

35

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of August, 2012, I caused a copy of the foregoing Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction to be filed electronically using the CM/ECF system, causing notice to be sent to the party listed below:

Maurice G. Knaizer                    Maurie.Knaizer@state.co.us

Melody Mirbaba                        Melody.Mirbaba@state.co.us

LeeAnn Morrill                        LeeAnn.Morrill@state.co.us

Matthew D. Grove                      Matt.Grove@state.co.us


                                      /s/ Allen Dickerson
                                      Allen Dickerson