IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-1708-JLK-KLM

COALITION FOR SECULAR GOVERNMENT, a Colorado nonprofit corporation,

    Plaintiff,

v.

SCOTT GESSLER, in his official capacity as Colorado Secretary of State,

    Defendant.
_____

**MEMORANDUM OPINION AND ORDER**
_____

KANE, J.

> Speech advocating approval or disapproval of a ballot issue is "'at the core of our electoral process and of the First Amendment freedoms,' . . . an area of public policy where protection of robust discussion is at its zenith."

*Grant v. Meyer,* 828 F.2d 1446, 1456-57 (10th Cir. 1987)(Moore, J.)(en banc).

  Plaintiff Coalition for Secular Government (CSG) is a small "think tank" that advocates for the separation of church and state. One of its advocacy pieces is a policy paper on "personhood" and, in years where a "personhood" initiative has qualified for Colorado's general election ballot, the paper addresses that initiative and urges a "no" vote. CSG's "electioneering" activities have been limited to "personhood" ballot measures in 2008, 2010, and again in 2014. CSG does not advocate for candidates or political parties.

  In 2012, faced with ongoing uncertainty that its "personhood" paper made it an "issue committee" under article XXVIII of the Colorado Constitution and related Fair

Campaign Practice Act (FCPA), CSG filed suit, seeking declaratory judgment and injunctive relief exempting it from the law's registration and expenditure disclosure requirements. Personhood's failure to qualify for the 2012 ballot eliminated the immediacy of CSG's request for relief, but the case is newly revived with the qualification of Colorado Amendment 67 on the 2014 ballot and CSG's desire to market and distribute its updated paper before the election.

Applying the standards articulated in *Sampson v. Buescher,* 625 F.3d 1247 (10th Cir. 2010), as interpreted by the Colorado Supreme Court in *Gessler v. Colorado Common Cause,* 327 P.3d 232 (Colo. 2014), I find CSG falls outside the scope of ballot issue-committees to which Colorado's campaign finance disclosure laws may constitutionally apply. The nature of CSG and its advocacy render any "informational interest" the government has in mandating contribution and expenditure disclosures so minimal as to be nonexistent, and certainly insufficient to justify the burdens compliance imposes on members' constitutional free speech and association rights.

This conclusion is so obvious, moreover, that having to adjudicate it in every instance as the Colorado Supreme Court implies is necessary *itself* offends the First Amendment. By setting in stone the uncertainty that precipitated this litigation in the first place, the Court's interpretation chills robust discussion at the very core of our electoral process. I am without authority, however, to undo the damage done because *Sampson* provides an adequate and binding legal standard under which CSG's specific constitutional claims may be decided. The wholesale invalidation of Colorado's $200 contribution threshold for ballot issue committees, though warranted, would go beyond

my charge and be improvident.  What I can do, however, is award CSG its attorney fees

under 42 U.S.C. § 1988 and advise state lawmakers that the Secretary will be on the hook

for fees every time a group, like CSG, falls under the $200 trigger for issue committee

status and has to sue to vindicate its First Amendment rights.

## I.

### *Background and Procedural History.*

Plaintiff Coalition for Secular Government ("CSG") is a nonprofit corporation that

"seeks to educate the public about the necessary secular foundation of a free society,

particularly the principles of individual rights and separation of church and state."  CSG

Mission Stm. (Tr. Ex. 40).  Its advocacy includes opposition to laws based on religious

scripture or dogma, such as abortion and discrimination against gay persons; government

promotion of religion such as the teaching of "intelligent design" in public schools; and

the granting of tax exemptions or other privileges to churches that are not made available

to other non-profits.  *Id.*  Its founder and sole principal is Diana Hsieh (pronounced

"Shay"), who holds a doctorate in philosophy.  CSG's advocacy takes the form of blog

posts and video blogs, and includes a lengthy policy paper on the consequences of

enshrining the concept of "personhood" into law.

CSG was originally entirely self-financed by Dr. Hsieh, but now solicits pledges

online to defray marketing and operating expenses and to pay Dr. Hsieh and the co-

author of the "personhood" paper a small ($1,000 in 2010) honorarium.  Combined

monetary and nonmonetary contributions to CSG have ranged from $200 in 2008 to

approximately $3,500 expected in 2014.  Given its small size and the nature of its

3

activities, it has never been clear that CSG is required to register as an "issue committee" under article XXVIII of the Colorado Constitution, or to meet the reporting requirements imposed under § 1-45-108 of the state's Fair Campaign Practice Act (FCPA).[1]  Not wanting to run afoul of the law, Dr. Hsieh elected to register CSG as an "issue committee" in 2008 and 2010, and did her best to comply with the FCPA reporting requirements.[2]

In October 2010, Dr. Hsieh's house flooded and in the confusion she was a day late in filing a committee report.  She was fined $50,[3] and her fine was only waived after she sought an administrative remedy.  When movement began on qualifying a Personhood Amendment for the 2012 election cycle, CSG filed suit, seeking a declaration that certain elements of article XXVIII § (2) and FCPS reporting requirements were unconstitutionally vague and overbroad and seeking preliminary injunctive relief from having to register in 2012.

---

[1] "Issue committee" under art. XXVIII § 2(10)(a) is defined as "any person, other than a natural person, or any group of two or more persons, including natural persons . . . [t]hat has a major purpose of supporting or opposing any ballot issue or ballot question; or . . . [t]hat has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question." Dr. Hsieh denies CSG's "major purpose" is to oppose or support any ballot issue, but concedes the CSG meets the $200 contribution threshold for such status.

[2] Dr. Hsieh testified at length at the trial held on October 3, 2014, and I found her intelligent and sincere -- virtually incapable of dissimilation.  According to Dr. Hsieh, she incorporated CSG in 2008 because she wanted to it to have "some kind of legally recognized status," but never imagined "in a million years" that she had to "register with the state to speak about a ballot measure."  Tr. at 10-12.  Her initial research suggested CSG was "in the clear," but when a friend familiar with Colorado's campaign finance regime second-guessed that conclusion, she investigated further.  Reviewing the relevant statutes and constitutional provisions, Dr. Hsieh found it "impossible" to figure out what she was supposed to do. Concerned CSG was "right at that $200 threshold," she decided to register.  *Id.*

[3] Article XXVIII § 10(2) imposes a penalty of $50 per day for each day that a statement or other information required to be filed is not filed.

When it became clear "personhood" would not make the 2012 ballot, it was agreed that the declarations CSG was seeking were uniquely matters of state law and appropriate for certification to the Colorado Supreme Court.  By Order dated October 10, 2012, I certified four questions[4] to the Court under Colorado Appellate Rule 21.1.  (Doc. 34).

By Order dated July 2, 2014, the State Supreme Court summarily dismissed the certified questions "in light of the Court's decision in case 12SC783 *Gessler v, Colorado Common Cause,* which was issued June 16, 2014."  (Doc. 40-1.)  I will discuss *Gessler* in more detail below, but its gist was to invalidate a rulemaking in which the Secretary sought to raise the contribution threshold for article XXVIII "issue committee" status from $200 to $5,000 in response to the Tenth Circuit's decision in *Sampson v. Buescher,* 625 F.3d 1247 (10th Cir. 2010).  In *Sampson,* the Tenth Circuit held unconstitutional Colorado's campaign finance disclosure requirements as applied to a single ballot-issue committee of neighbors that had spent $1,000 to challenge an annexation initiative. The Court applied "exacting scrutiny" to the case, invalidating Colorado's disclosure requirements on grounds the burdens imposed could not be justified by the public's

---

[4] The questions were as follows:

> 1. Is the policy paper published by the Coalition for Secular Government (CSG) in 2010 "express advocacy" under Art. XXVIII, § 2(8)(a) of the Colorado Constitution?
> 2. If the policy paper is express advocacy, does it qualify for the press exemption found at Art. XXVIII, § 2(8)(b)?
> 3. Is the policy paper a "written or broadcast communication" under § 1-45-103(12)(b)(II)(B), C.R.S.? If not, did it become a "written or broadcast communication" when it was posted to CSG's blog or Facebook page?
> 4. In light of *Sampson v. Buescher,* 625 F.3d 1247 (10th Cir. 2010), what is the monetary trigger for Issue Committee status under Art. XXVIII § 2(10)(a)(II) of the Colorado Constitution?

informational interest in how the group made and spent its money. *Id.* at 1261 (holding

government's informational interest was "minimal, if not nonexistent, in light of the

small size of the contributions"). The Court specifically declined, however, to draw a

"bright line below which a ballot-issue committee cannot be required to report

contributions and expenditures," stating only that the case before it was "quite unlike

ones involving the expenditure of tens of millions of dollars," (where, presumably,

disclosure would be constitutionally justified). *Id.* (citing *Cal. Pro-Life Council, Inc. v.*

*Getman*, 328 F.3d 1088, 1105 (9th Cir. 2003).[5]

Given the limited holding in *Sampson*, *Geller*'s rejection of efforts to raise the

issue committee contribution threshold to $5,000, and the Supreme Court's refusal

answer the certified questions in this case -- I am left to assess CSG's issue committee

status only after a formal adjudication on an evidentiary record.[6]  I have done so, and rule

as follows:

## II.

### *Findings of Fact and Conclusions of Law*.

Art. XXVIII of the Colorado Constitution declares the Legislature's intent in

enacting campaign disclosure regulations:

The people of the state of Colorado hereby find and declare ... that large
campaign contributions made to influence election outcomes allow wealthy

---

[5] Because *Sampson* was not a facial invalidation of article XXVIII's $200 contribution threshold, the Court in *Gessler* concluded the Secretary's attempt to raise the threshold to $5,000 on his own exceeded his authority and set it aside.

[6] Justice Eid recognized as much in her dissenting opinion in *Gessler:* "In the end . . . the Secretary [is left] with only one option:  post-hoc, case-by-case adjudications to determine whether the particular small-scale issue committee in question is 'sufficiently similar' to the one at issue in *Sampson* to warrant being excused from certain reporting requirements."  327 P.3d at 238.

> individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process ... that political contributions from corporate treasuries are not an indication of popular support for the corporation's political ideas and can unfairly influence the outcome of Colorado elections; and that the interests of the public are best served by ... providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

Art. XXVIII § 1, Colo. Const.  Colorado's Fair Campaign Practice Act (FCPA) provides that "issue committees… shall report to the appropriate officer their contributions received, including the name and address of each person who has contributed twenty dollars or more; expenditures made, and obligations entered into by the committee or party."  Colo. Rev. Stat. Ann. § 1-45-108 (1)(a)(I) (West 2013).

Art. XXVIII §2 (10)(a) of the Colorado Constitution defines "issue committee" as "any person, other than a natural person, or any group of two or more persons, including natural persons:  (I) That has a major purpose of supporting or opposing any ballot issue or ballot question; or (II) that has accepted or made contributions or expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question."  Under a technical reading of the law and after *Sampson*, CSG meets the "issue committee" test by virtue of its $200 - $3,500 in annual contributions that it then uses to support the distribution of its policy paper.[7] The next question, then, is whether CSG may constitutionally be

---

[7] CSG argues it should not be considered an "issue committee" because its "major purpose" is not to oppose Colorado's Personhood Amendment.  It also argues that the moneys it uses to create and distribute its personhood paper cannot be considered "expenditures" for purposes of issue committee

required to submit to the FCPA's reporting requirements under *Sampson.*  Clearly
it cannot.

Reporting and disclosure requirements by their nature "infringe on the right of
association." *Sampson* at 1255.  "'Detailed record-keeping and disclosure obligations
impose administrative costs that many small entities may be unable to bear.'"  *Id.*
(quoting Justice Brennan in *Federal Election Comm'n v. Massachusetts Citizens for Life*,
479 U.S. 238 254 (1986)).  Not all such burdens are unconstitutional, however, and may
be upheld upon a showing of a substantial relation between the disclosure requirement
and a "sufficiently important governmental interest."  *Id.* (citing *Doe v. Reed*, 561 U.S.
186, 196 (2010)).  The standard is one of "'exacting scrutiny,'" *id.,* and to withstand such
scrutiny, the strength of the governmental interest "must reflect the seriousness of the
actual burden on First Amendment rights" and exceed it.  *See id.* This is the case-by-case
determination with which we are concerned.

Here, it is important to distinguish the government's interest in regulating groups
that advocate for particular candidates from those supporting or opposing ballot
initiatives:

> When analyzing the governmental interest in disclosure
> requirements, it is essential to keep in mind that our concern is with ballot
> issues, not candidates.  The legitimate reasons for regulating candidate
> campaigns apply only partially (or perhaps not at all) to ballot-issue
> campaigns.  For example, the Supreme Court has upheld limits on

---

status because they are not spent "to oppose" the Amendment.  CSG's points are well taken, in that CSG clearly exists independently of and in addition to its personhood paper, which is but one of its many advocacy issues.  Nevertheless, given that most of CSG's modest financial dealings go to the support of the personhood paper and because the paper explicitly urges a "no" vote on Amendment 67, I assume, for the sake of the *Sampson* inquiry before me, that CSG has accepted or made contributions or expenditures in excess of two hundred dollars to oppose Amendment 67 in the 2014 election cycle.

> contributions to candidates on the ground that the limits are necessary to
> avoid the risk or appearance of *quid pro quo* corruption – the exchange of a
> contribution for political favor.  [Citations omitted.] Limits on contributions
> to ballot-issue committees, in contrast, are unconstitutional because of the
> absence of any risk of *quid pro quo* corruption.  [Citations omitted.]

*Sampson*, 625 F.3d at 1255.  "The risk of corruption perceived in cases involving

candidate elections . . . simply is not present in a popular vote on a public issue."  *Id.*

(quoting *First Nat'l Bk of Boston v. Bellotti*, 435 U.S. 765, 790 (1978)).

Accordingly, of the three "proper" justifications for reporting and disclosing

campaign finances articulated by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 68

(1976), only the third – the public's "informational interest" –  applies to ballot issue

committees.  *Sampson,* 625 F.3d at 1256.[8]  Even this interest, the court continued, is "not

obvious" in ballot cases:

> Candidate elections are, by definition, ad hominem affairs.  . . . In contrast,
> when a ballot issue is before the voter, the choice is whether to approve or
> disapprove of discrete governmental action, such as annexing territory,
> floating a bond, or amending [the state constitution].  No human being is
> being evaluated.

*Id.*  Even allowing for the "not obvious," then, CSG may be subjected to

Colorado's reporting and disclosure requirements on grounds of the public's

informational interest only.  *Id.*

After *Sampson,* the standard for this determination is "whether the small-scale

issue committee in question is 'sufficiently similar' to the one at issue in *Sampson* to

---

[8]  The first -- that reporting and disclosure requirements can be used to detect violations of contribution limitations, *Valeo* at 68, "is mooted by the prohibition on contribution limitations in the ballot-issue context."  *Sampson,* 625 F.3d at 1256.  The second – that disclosure can deter actual corruption, avoid the appearance of corruption, and facilitate the detection of post-election favoritism, *ibid.*, "is irrelevant because . . . *quid pro quo* corruption cannot arise in a ballot-issue campaign."  *Sampson* at 1256.

warrant being excused from certain reporting requirements." *Gessler,* 237 P.3d at 238 (Eid, J.). The Secretary contends it is not, distinguishing the groups based on the breadth of their respective messages and relative interest in their issue. *See e.g.* Hg. Tr. at 174 (pointing out that CSG "coordinat[es] with national groups to get their message out" while the *Sampson* plaintiffs were "restricted to a very small, very narrow issue"); Tr. at 78 (noting CSG's paper was downloaded "approximately 12,000 or more" in 2010, a number that "doesn't include the page views of the paper" that was posted "chapter by chapter on CSG's blog."). The Secretary's point is perplexing: Is he suggesting that the effectiveness of political speech -- the fact it resonates, generates interest, and is downloaded from the internet by individuals wanting to read it – somehow elevates or enervates the public's informational interest in its disclosure? The more vibrant the public discourse the more justified the burdening of the speech is? Surely not. It must be remembered by those older than Ms. Hsieh that the internet is the new soapbox; it is the new town square. CSG's "personhood" paper is Tom Paine's pamphlet. It is the quintessence of political speech.

In the present case, CSG plans to spend no more than $3,500 to conduct all of the business of CSG, which includes publishing and distribute the "personhood" paper and seed money to incentivize other authors and "get[] intellectual projects off the ground." Tr. at 40. While this is more than the $1,000 contemplated by the Tenth Circuit in *Sampson*, it is magnitudes less than the opposite pole the court used for contrast (tens of millions of dollars for "complex policy issues"). As the court stated, the state interest in ballot issue campaign finance is significantly attenuated when compared to candidate

campaign finance; even less so when the "issue committee" here is similarly situated to the plaintiffs in *Sampson* in that it is interested in a single ballot issue.

Given the nature of the ballot question and the nature of the expenditures, this is a a case where the state's informational interest is truly "not obvious."  What financial interest or other untoward benefit could CSG's principals or pledge contributors realize in a defeat of the Personhood Amendment?  Even so, the amount of the expenditures  -- no more than $3,500 – limits the informational value of the public's "right to know." Colorado's issue committee disclosure laws are concerned with "large campaign contributions" that allow "wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process."  Colo. Const. art. XXVIII § 1.  The terms "large," "wealthy," or wielding "disproportionate influence" are simply not germane to the activity in which CSG is engaged.  Voters' interest in the $3,500 CSG might spend this year on all of its ballot and non-ballot related activities combined is so minimal as to be non-existent.

Even if there is any informational interest in the $3,500 CSG has raised, that interest is outweighed by the burdens CSG has suffered and will continue to suffer in trying to comply with issue committee reporting requirements.  The Secretary disagrees, noting there are only a few reporting periods left in the 2014 election cycle, and because CSG has reported as an issue committee in the past, complying with those rules in the few weeks leading up to election day will not be burdensome.  The Secretary misses the point:  the burdens at issue are not merely clerical or administrative, they are restrictions on speech and association.  *FEC v. Massachusetts Citizens for Life,* 479 U.S. at 254.

CSG's ballot-issue advocacy, to the extent it renders it an "issue committee" at all, is sufficiently like that of the *Sampson* neighbors that its obligation to comply with FCPA reporting requirements must be excused.

Unfortunately, given the Tenth Circuit's refusal "to establish a bright line below which a ballot issue committee cannot be required to report contributions and expenditures" and the Supreme Court's election not to answer the certified questions, I must make a ruling on the specific facts of this case based on what I determine, *sui generis*, to be reasonable.  I say "unfortunately" because this state of affairs means that no precedent has been established and the stability this matter of considerable public importance so needfully requires will have to await another day or days and even more lawsuits.[9]

### III.

### *Conclusion.*

Based on the foregoing, it is formally ORDERED and DECLARED that CSG's expected activity of $3,500 does not require registration or disclosure as an "issue committee" and the Secretary is ENJOINED from enforcing FCPA disclosure requirements against it.

1. The Plaintiff has established clearly and convincingly that it will suffer
   irreparable injury to its First Amendment right of free association.  As stated in

---

[9] Though I need not rule on this issue definitively – and it was not raised by the parties – I suggest the "post hoc, case-by-case review" mandated by the Colorado Supreme Court majority is itself unconstitutional and respectfully disagree that *Sampson* compels it.  The sheer expense and delay of unnecessary litigation chills, if not freezes entirely, prospective speakers' resolve to exercise their First Amendment rights and should be mitigated with due haste.

*Sampson*, "We agree with [plaintiff's] as-applied First Amendment argument, holding that Colorado registration and reporting requirements have unconstitutionally hindered their First Amendment right of free association." The same is true in the case at bar because the distinctions between it and *Sampson* are insignificant.  If anything, it must be stated that the "personhood" policy paper at issue is quintessential political speech, worthy of the highest constitutional protections, whereas the protected activity in *Sampson* was of a different magnitude entirely.  A violation of a First Amendment right *ipso facto* constitutes irreparable injury.

2. The denial of a First Amendment right far outweighs the claimed harms asserted by the opposing party, which amounts to nothing more than a bureaucratic inconvenience in not taking action in discrete cases.

3. The injunction is in the public interest because it supports and vivifies the fundamental constitutional rights of the citizenry.

4. The plaintiff has succeeded in demonstrating an imminent threat of irreparable injury.  Any harm the injunction would cause is illusory because all it does is prohibit the Secretary from enforcing Colorado law against a limited number of persons in a way that would violate their constitutional rights.

5. Given the nature of the case, no bond is required.

In light of the foregoing, preliminary injunctive relief is unnecessary and Plaintiff's original and renewed Motions for Injunctive Relief (Docs. 13, 41) are DENIED as MOOT.

In addition, Plaintiff's request for attorney fees under 42 U.S.C. § 1988 is also GRANTED.  Section 1988 is designed to enable individuals to act as private attorneys general to vindicate their constitutional and other civil rights and Plaintiff has done so in this case.  Plaintiff shall have to and including October 28, 2014, to submit an affidavit delineating its fees with an expert endorsement of their reasonableness.  If the parties reach an informal resolution of the fee matter before then, so much the better.

Dated October 10, 2014.


s/John L. Kane
SENIOR U.S. DISTRICT JUDGE